Filed 6/20/13  P. v. Thompson CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE, | B242201 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  BA366565) |
| v. | |
| JASON JAVON THOMPSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail R. Feuer, Judge.  Convictions affirmed; sentence vacated and remanded.

Edward J. Haggery, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jason Javon Thompson, convicted of one count of sexual assault of a child under the age of 14 and one count of continuous sexual abuse of a child, contends he was not competent to stand trial and that the trial court's contrary finding was not supported by substantial evidence. He further contends: (1) the trial court erred in permitting the jury to see the videotape of his police interview because his *Miranda* waiver was not knowingly or intelligently made and the statements were obtained by coercion;[1] (2) the court erred in failing to instruct the jury on the lesser offense of sodomy with a minor; (3) the court erred in excluding certain opinion testimony from appellant's half-brother and stepfather concerning his intellectual ability; (4) the court abused its discretion in denying a request for a continuance to obtain the appearance of appellant's psychological expert; (5) the denial of the continuance violated his due process rights; (6) counsel's failure to secure the appearance of the psychologist represented ineffective assistance of counsel; (7) CALCRIM No. 1120 erroneously negates one of the elements of the crime of continuous sexual abuse and is argumentative; (8) the court imposed a consecutive sentence on the continuous sexual abuse count under the erroneous impression that it was mandatory; (9) the court failed to explain its reasons for imposing consecutive terms; and (10) the imposition of a $500 restitution fine was not supported by substantial evidence of ability to pay. We remand for resentencing on the continuous sexual abuse count and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Information*

In a three-count information, appellant was charged with (1) aggravated sexual assault of a child under the age of 14, specifically alleged to have been

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

committed between April 1997 and April 1998 (Pen. Code, § 269, subd. (a)(3), count one); (2) continuous sexual abuse of a minor under the age of 14, alleged to have occurred during the period from April 1998 to April 2003 (§ 288.5, subd. (a), count two); and sodomy by force of a victim over the age of 14, specifically alleged to have been committed between April 2003 and April 2004 (§ 286, subd. (c)(2)).[2]

B. *Evidence at Trial*

1. *Prosecution Evidence*

Crystal C., appellant's half sister, testified that the sexual abuse began in 1997, when she was eight and appellant was 21 or 22. At the time she lived with her mother and father, Monica and John C., and her brothers Aaron C., Johnny C., and appellant. She stayed home from school one day due to illness and saw appellant watching a pornographic video featuring anal sex.[3] Later that day, she was asleep in her room, lying on her stomach. She was awakened when appellant got on top of her and inserted his penis in her anus. It hurt and she started to cry and scream. Appellant applied sufficient force that she could not get up. After appellant finished, he threatened to kill her if she told anyone. She believed him because he was "always violent."

Crystal testified that following that initial incident, appellant regularly sodomized her until she turned 14, up to three times a week. During the acts, he often played loud music by a particular rap group. Sometimes he would give her presents, such as jewelry, shirts and money. Once he put money on the floor, and

---

[2]     Undesignated statutory references are to the Penal Code. After the close of evidence, the court struck an allegation that appellant committed the continuous sexual abuse by use of force under section 1203.066.

[3]     Crystal suffers from a condition that causes weakness in her legs.

when she bent down to pick it up, he sodomized her. On several occasions, he threatened to kill her if she told anyone. On at least one occasion, appellant sodomized her with a bar of soap while she was bathing.[4] When Crystal was 12, appellant kissed her on the mouth. Crystal recalled a specific occasion that occurred when she was 14 when appellant forced himself on her. During the act, she tried to get up, but his body was on top of hers and she was not strong enough.

The last sexual incident occurred when Crystal was 14, asleep in the living room. On that occasion, she awoke to find appellant touching her buttocks and masturbating. She started crying and asked him why he was doing it to her. Appellant ran out of the room. Crystal's brother Aaron woke up and asked Crystal why she was crying. Appellant returned and also asked what was wrong, as if he had done nothing.

Shortly after the final incident, Crystal told a friend at school about the abuse. The friend advised her to tell her mother, Monica, and Aaron. Crystal told Aaron and they both informed Monica. Monica confronted appellant, struck him, and told him to stop and to apologize to Crystal. Monica persuaded Crystal and Aaron not to tell their father, John, convincing them that he would kill appellant and be sent to jail and that the family would be broken up.[5] A few years later, when Crystal was in high school, she told some friends and a teacher. Police officers came to the family home and asked Crystal about the allegations. She denied that anything had happened because Monica had told her she would end up in foster care if she told the truth.

---

[4]     Crystal initially testified this happened one time and later stated it had happened multiple times.

[5]     At trial, Aaron confirmed that Crystal had reported the abuse to him when she was 14, that they had both informed Monica, that Monica had confronted and struck appellant, and that Monica had warned them not to say anything to John. Aaron and John also testified that appellant possessed pornography relating to anal sex.

In January 2010, when the family was planning to move to a new home, Crystal and Aaron informed their parents that they did not want to live with appellant. Monica told Crystal she needed to forgive appellant. John asked what was going on and Crystal told him about the abuse. John confronted appellant and asked if he had sodomized Crystal. Appellant began to cry and said, "I don't know."[6] The following day, Monica and appellant moved out of the family home. On January 5, John took Crystal to a police station to report the abuse.

On the day of his arrest, appellant was interviewed by Detective Timothy Shumaker.[7] Appellant stated he knew Detective Shumaker was "the detective." Detective Shumaker asked appellant if he knew why he had been arrested; appellant answered "[y]eah," and immediately added, "that's not true, you know." After advising appellant of his *Miranda* rights, Detective Shumaker asked if he wanted to talk about what happened. Appellant replied: "Yeah. Crystal is hallucinating a lot, takes Xanax. She goes crazy on me, and she hits me." The detective asked about their relationship and appellant stated that Crystal was "sometimes real mean and vicious," and would tell him to "[s]hut the hell up" and "leave [her] the hell alone."

Detective Shumaker advised appellant to be "100 percent honest," and added: "[I]f you're not going to do that, you're not going to be truthful, then we're going to go nowhere. . . . It's going to just frustrate me." Appellant agreed he would be "dead" if the detective found out he was lying. Detective Shumaker asked for background information about the period when the abuse reportedly began. Appellant said he had smoked marijuana "basically" on a daily basis. He then acknowledged: "I touched her. That's about it." He went on to state that he

---

[6] Aaron confirmed the conversation and appellant's response.

[7] A video of the interview was played to the jury.

put his hand under Crystal's dress when she was ten. Asked specifically about engaging in anal sex or sodomy with Crystal, appellant denied it.

Employing a ruse, Detective Shumaker stated that Crystal had maintained a diary and had written down specific details about the abuse when it occurred. At that point, appellant admitted sodomizing Crystal. Appellant claimed that Crystal had initiated the molestation when she was eight by coming into his room and kissing him and said that there was "no force or nothing." He denied watching pornography in front of her or abusing her with soap. He denied threatening her.

After admitting to sodomizing Crystal, appellant stated, "I'm putting myself in a grave right now." Detective Shumaker replied: "Well, you're being honest. And when you come out and [are] honest . . . you know, the truth will set you free." After that exchange, the detective began to inquire about the frequency of the abuse. Appellant denied that the sexual incidents happened "every day," and initially stated he had sodomized Crystal "twice." Detective Shumaker asked if he meant "twice a month." Appellant then stated it happened once or twice a month or once a week until Crystal turned 14. Appellant later stated there were only ten occasions and that it occurred "with her permission." He ultimately confessed that the incidents had occurred hundreds of times over the years. Asked about other sexual acts, appellant stated that he had kissed Crystal and touched her vagina "like three times," and that she touched his penis and "came on to [him]." He initially indicated that he was only 17 when the abuse began, but later admitted he was actually 21 or 22.

Detective Shumaker asked about the incident that had allegedly occurred when Crystal was 14 and asleep on the couch. Appellant denied touching her when she was asleep, but stated that she "came on to [him]" when she was 14 and he "react[ed]" once or twice. He initially denied giving Crystal any presents other

6

than Christmas presents during this period, but then admitted he sometimes gave her money. He denied threatening her.

After admitting to sodomizing Crystal on a number of occasions, appellant asked the detective what was going on and if he was "doing the right thing." The detective stated that if he was lying, he was lying to himself and "who's that going to help?" Later, appellant asked: "Is there any way I could work through this like with you? . . . Is there any way I could work this out?" Detective Shumaker said he would "see what [he] could do." Near the end of the interview, appellant asked if there was a way he could "work with things" or if he could just "leave the city" and if the detective needed to "talk to the DA." The detective stated that someone else would make the decision, but that he could tell the DA that appellant was being honest and that appellant was "getting closer to the truth" with regard to the continuous nature of the abuse.

### 2. *Defense Evidence*

The defense called Officer Alicia Castro, who had interviewed Crystal when John took her to report the abuse. Officer Castro's report indicated that Crystal had described the first incident differently than she had at trial. Crystal told the officer that she recalled appellant pulling up her nightgown and taking off her underwear. Crystal had also said that appellant had taken a shower afterward and did not report that he had worn a condom.[8] With respect to other incidents, Crystal had told Officer Castro that appellant had sodomized her with soap 20 times. Crystal had not told the officer that appellant played specific music or that he had thrown money on the floor and sodomized her when she bent down to pick it up.

---

[8] During her testimony, Crystal had said she took a bath afterward. During the preliminary hearing, she said he had been wearing a condom. During trial, she indicated he was not wearing a condom and had deposited semen on her.

7

C. *Pertinent Argument*

During closing argument, the prosecutor made clear that count one was based on the first incident of sodomy when Crystal was eight and count three was based on the sodomy that Crystal had described taking place when she was 14. The prosecutor argued that use of force sufficient to overcome Crystal's will was evident from the fact Crystal was face down with appellant on top of her, and that she was unable to get up. With respect to count two (continuous sexual abuse), the prosecutor argued that it could be established either by the evidence of multiple acts of sodomy or by the evidence of lewd and lascivious conduct, such as touching Crystal's buttocks, touching her vagina, or kissing her, if "sexual intent" was present or if appellant was "thinking about sex when he's kissing her [or] . . . touching her vagina."

The defense argued that the discrepancies between Crystal's testimony and her statement to Officer Castro cast doubt on her credibility. Defense counsel further argued that the confession was unreliable because appellant had difficulty understanding what was going on and that Detective Shumaker manipulated him into admitting that the abuse occurred and even into admitting things that Crystal had denied -- that appellant touched her vagina and that she touched his penis. Defense counsel did not focus any argument on the use of force.

D. *Verdict and Sentencing*

The jury found appellant guilty of aggravated sexual assault between April 1997 and April 1998 (count one) and continuous sexual abuse from April 1998 to April 2003 (count two). The jury was unable to reach a verdict on count three, which was subsequently dismissed. The court sentenced appellant to 15 years to life on count one, the mandatory sentence, and imposed a consecutive 16-year sentence on count two.

8

## DISCUSSION

### A. *Competence to Stand Trial*

#### 1. *Background*

In September 2010, defense counsel declared doubt as to appellant's competence to stand trial. The court suspended proceedings and appellant was evaluated by two psychiatrists and a psychologist -- Ari Kalechstein, Ph.D. for the defense and Sanjay Sahgal, M.D. and Greg Cohen, M.D. for the prosecution. The doctors prepared written reports setting forth their findings and conclusions. Dr. Kalechstein opined that appellant's developmental disability impaired his capacity to comprehend his attorney's instructions and advice, to plan legal strategies, and to follow the proceedings in court. Dr. Sahgal concluded that although appellant had cognitive issues and low intelligence, he was competent to stand trial and capable of engaging with counsel and aiding in his defense. Dr. Cohen likewise concluded appellant was competent to stand trial.

The parties agreed to submit the issue to the court based solely on the doctors' written reports. The court also reviewed police records. The court found appellant competent to stand trial. The court noted that the reports and records indicated appellant had "a good vocabulary," had "historically . . . been able to hold down jobs for long periods of time," had filled out a detailed employment application, and had proven himself capable of responding to questions and understanding the charges against him. The court stated that these factors contradicted Dr. Kalechstein's conclusion that appellant was lacking in verbal skills or the ability to understand what was happening. The court noted that Dr. Sahgal and Dr. Cohen were both court-approved psychiatrists, while Dr. Kalechstein was a psychologist, not among those approved by the court, and his report did not detail his training or experience. Ultimately, the court found the conclusions of Dr. Sahgal and Dr. Cohen more credible. Appellant contends the

court's finding was not supported by substantial evidence, and that his due process rights were violated by subjecting him to trial while he was incompetent.

### 2. *Analysis*

There is no dispute that the due process clause of the Fourteenth Amendment prohibits a state from trying or convicting a person who is mentally incompetent. (*People v. Ary* (2011) 51 Cal.4th 510, 517; *People v. Ramos* (2004) 34 Cal.4th 494, 507; see § 1367, subd. (a).) A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a); *People v. Lawley* (2002) 27 Cal.4th 102, 131.)[9] Appellant contends the trial court's finding of mental competence was not supported and that trying and convicting him for the charged offenses violated his due process rights.

Under California law, a defendant is presumed competent unless he or she proves the contrary by a preponderance of the evidence. (§ 1367, subd. (a); *People v. Lawley*, *supra*, 27 Cal.4th at p. 131.)[10] When a trial court's finding of competence is challenged on appeal, "the reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the trial court's finding." (*People v. Lawley*, *supra*, at p. 131.) The court must appoint one or more experts to evaluate a defendant once a substantial doubt arises as to his or her legal competence. (See § 1369, subd. (a); Rules of Court, rule 4.130 (d)(1)(A).) If the experts reach contradictory conclusions, the trial court properly

---

[9] Neither at trial nor on appeal has appellant argued that he suffered from a mental disorder.

[10] As explained in *People v. Ary*, *supra*, 51 Cal.4th at p. 518, this allocation of the burden of proof does not violate due process.

10

assesses and weighs the persuasiveness of the findings based on the material from which the opinions are fashioned and the reasoning by which the experts progressed to their conclusions. (*People v. Lawley*, *supra*, at p. 132.) The defendant's behavior may also aid the court in evaluating competence. (See *People v. Ramos*, *supra*, 34 Cal.4th at p. 507.)

Here the trial court reviewed the experts' reports and found the bases for Dr. Kalechstein's opinion undermined by the evidence of appellant's behavior in other aspects of his life, including his behavior with the police. The court reasonably concluded the opinions of Dr. Cohen and Dr. Sahgal were more credible than Dr. Kalechstein's based on that factor and on their superior qualifications. As the material presented to and reviewed by the court provided support for the conclusion that appellant had sufficient mental acuity to understand the proceedings and consult with his lawyer, the court's finding that he was competent to stand trial is supported by substantial evidence.

B. *Motion to Suppress Confession*

1. *Background*

Prior to interviewing appellant about the allegations, Detective Shumaker advised appellant of his *Miranda* rights by way of the following exchange: Detective Shumaker: "You have the right to remain silent. Do you understand?" [Appellant]: "Yes." Detective Shumaker: "Anything you say may be used against you in court. Do you understand?" [Appellant]: "Yes." Detective Shumaker: "You have the right to the presence of an attorney before and during any questioning. Do you understand?" [Appellant]: "Yes." Detective Shumaker: "If you cannot afford an attorney, one will be appointed for you free of charge before questioning if you want. Do you understand?" [Appellant]: "Yes." Detective

Shumaker: "And then do you want to talk about what happened?" [Appellant]: "Yes."

The prosecution filed a trial brief seeking the admission of appellant's statements during the interview with Detective Shumaker. The defense objected, contending appellant had not made an intelligent and knowing waiver of his *Miranda* rights, and that the confession was coerced by a promise of freedom. To determine its admissibility, the court watched the videotape of appellant's confession, heard testimony from defense expert Dr. Kalechstein and prosecution expert Barry Hirsch, Ph.D., and reviewed reports prepared by the experts.

Psychologist Kalechstein, who held a Ph.D. in psychology, testified that he conducted an evaluation of appellant in 2010 and concluded appellant could not have provided a knowing and intelligent waiver of his *Miranda* rights. Tests administered by Dr. Kalechstein indicated appellant's I.Q. was 64 or 66, which Dr. Kalechstein believed gave him the understanding of a second or third grader. Dr. Kalechstein expressed the opinion that the job appellant had at the Braille Institute at the time of his arrest was a simple one, and that a person with a low I.Q. could function well in the right job environment. In connection with his evaluation, Dr. Kalechstein had reviewed appellant's school records, which indicated poor and declining academic performance; he had not reviewed any of appellant's job applications or his prior job history. Nor had he reviewed the transcript of the interview with Detective Shumaker or any police reports.

During his evaluation, Dr. Kalechstein administered a test in which he read appellant a version of the *Miranda* waiver and asked him to explain each sentence. He concluded appellant did not understand most of the components of his *Miranda*

12

rights.[11] Dr. Kalechstein also administered tests geared toward determining whether appellant was malingering, and concluded that appellant was trying his best and not pretending to be less functional than he was. Dr. Kalechstein expressed the opinion that appellant regularly engaged in "masking," pretending to understand a question when he did not by repeating the words of the question in his answer. Dr. Kalechstein further expressed the opinion that appellant's attempt to deflect blame did not reflect a mature understanding of his situation, and that a young child would do the same if caught doing something wrong.

The prosecution expert, Dr. Hirsch, who held a Ph.D.in psychology, evaluated appellant and concluded that he could understand his *Miranda* rights and knowingly waive them. Dr. Hirsch expressed the opinion that appellant had been malingering with Dr. Kalechstein. Dr. Hirsch had read the transcript of the interview and the police reports and reviewed appellant's employment history. Dr. Hirsch based his opinion on how appellant functioned during the evaluation, in the interview with Detective Shumaker, and in the real world. During the evaluation, appellant appeared to have no difficulty communicating with or understanding the doctor. In the interview with the detective, appellant's answers were coherent and responsive. There was never a point when appellant seemed to misunderstand the questions being asked and he appeared to have no problems with memory. He provided reasons for Crystal to be lying or mistaken, such as her use of psychoactive medication. More important, appellant's statement that he was "digging [his] own grave" made clear that he knew he had made incriminating

---

[11]  Dr. Kalechstein did not use the same version of the *Miranda* warnings as Detective Shumaker. For example, Dr. Kalechstein asked if defendant understood the statement """You are entitled to consult with an attorney before interrogation and to have an attorney present at the time of the interrogation.""" In advising appellant, Detective Shumaker had used a different phrase: "You have the right to the presence of an attorney before and during any questioning."

admissions. Dr. Hirsch detected no evidence of masking. With respect to real world functioning, the fact that appellant was able to learn Braille at the level of a second grader indicated a higher level of intellect than measured by Dr. Kalechstein, as did his ability to hold jobs as a cook, cashier and courier, and to navigate to and from his jobs without a car. Dr. Hirsch attributed appellant's declining academic performance to his regular use of marijuana.

The court denied the motion to exclude the admission. Having viewed the videotape of appellant's confession, the court noted that appellant clearly understood difficult words such as "dehydrated," "sodomy," "sodomize[]," "vagina," and "anal." Appellant came across as a normal person with an average I.Q. The court specifically found appellant's statements about digging himself a grave and about Crystal's accusations arising from her use of Xanax indicated a certain amount of sophistication. The court further concluded that appellant's ability to hold down his different jobs and to learn elementary Braille were indications of a higher level of intellectual ability than the I.Q. tests revealed. The court reviewed the test administered by Dr. Kalechstein to determine appellant's understanding of the *Miranda* warning, and pointed out an alternate interpretation to masking, namely, that appellant truthfully stated that he understood the admonitions.

With respect to possible coercion, the court found the detective's comment, "the truth will set you free" was a general statement about relieving one's conscience rather than a promise of freedom. The court concluded that the confession was not coerced. Appellant contends the court erred in finding the *Miranda* waiver knowing and intelligent and the interview statements uncoerced.

2. *Analysis*

a. *Knowing and Intelligent Waiver*

"Under the familiar requirements of *Miranda*, designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." (*People v. Sims* (1993) 5 Cal.4th 405, 440.) The prosecution bears the burden of demonstrating that a defendant who makes a statement in the absence of counsel knowingly and intelligently waived the privilege against self-incrimination and the right to counsel. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1192.)

"[I]n order to determine whether a defendant voluntarily, knowingly, and intelligently has waived his *Miranda* rights, a court analyzing the question must consider two distinct components: 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]'" (*People v. Whitson* (1998) 17 Cal.4th 229, 247, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421.)

"'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under [*Miranda*], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.'" (*People v.*

15

*Whitson*, *supra*, 17 Cal.4th at p. 248, quoting *People v. Wash* (1993) 6 Cal.4th 215, 235-236.) Although appellate courts "'independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation]," we ""'give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.'" (*Ibid.*)

With regard to appellant's reported lack of mental acuity, a low I.Q. does not by itself represent ""'a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood.""'" (*People v. Lewis* (2001) 26 Cal.4th 334, 384.) Instead, a defendant's intellectual level is merely a factor to be considered together with all other factors surrounding the waiver. (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1171; *In re Norman H.* (1976) 64 Cal.App.3d 997, 1001; *U.S. v. Crews* (9th Cir. 2007) 502 F.3d 1130, 1140.)

Here, although the record clearly indicates that appellant was advised of and waived his *Miranda* rights prior to being interviewed by Detective Shumaker, he contends the waiver was not knowing and intelligent. Dr. Hirsch evaluated appellant and concluded he was able to understand his rights and knowingly and intelligently waive them. Dr. Hirsch based his conclusion on appellant's ability to function in the real world and on his ability to understand and communicate with the detective in the interview and with the doctor in the evaluation. In ruling the confession admissible, the court relied on Dr. Hirsch's opinion and on the court's own review of the interview tape.[12] The court saw nothing in appellant's behavior or demeanor to suggest a debilitating level of mental impairment or inability to

---

[12] The record reflected that Dr. Kalechstein had not watched the interview prior to expressing his opinion concerning the waiver.

16

understand basic legal concepts.  To the contrary, the interview reflected an understanding of language, including some difficult words.  Moreover, as the court observed, appellant's statement about digging his own grave and his attempt to undermine Crystal's credibility by informing the detective of her mental health issues and use of Xanax reflected that he understood his legal predicament and was attempting to create skepticism about the accusations.

In his brief, appellant focuses on the report and testimony of Dr. Kalechstein, who expressed the opinion that appellant's lower than average I.Q. rendered him unable to comprehend the meaning and consequences of the waiver and, in particular, on the test Dr. Kalechstein administered to determine appellant's understanding of the various *Miranda* admonitions.  Appellant contends "the defense presented objectively verifiable evidence that [appellant] . . . did not understand key components of the rights he allegedly waived" and that the trial court "ignored his inability to understand the unfamiliar concepts contained in the *Miranda* warnings as shown by his poor performance on the . . . *Miranda* test."  The record reflects that the court did not ignore the test, but reviewed it and the supporting data carefully.  As the court stated, appellant's actual responses indicated an understanding of the admonitions.  It was Dr. Kalechstein's interpretation of those responses that led him to opine that appellant was "masking," pretending to understand words and concepts he did not. The court reasonably concluded otherwise based on Dr. Hirsch's opinion, the underlying data, appellant's ability to comprehend the detective's questions during the interview, and his ability to successfully maneuver in the job market and other real world settings.  The court's conclusions were reasonable and supported by substantial evidence.

17

b. *Coercion*

A confession is considered coerced or involuntary if it was "'"'"extracted by any sort of threats'"'"' or "'"'"obtained by any direct or implied promises.'"'"' (*People v. Neal* (2003) 31 Cal.4th 63, 79.) Pointing to Detective Shumaker's statement that "the truth will set you free," appellant contends the detective coerced the confession by impliedly promising him freedom if he admitted abusing Crystal.

Determining whether a statement is voluntary or coerced "does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.'" (*People v. Neal*, *supra*, 31 Cal.4th at p. 79.) The ultimate issue presented is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1008.) In making this determination, courts consider "the nature of the interrogation and the circumstances relating to the particular defendant." (*People v. Dykes* (2009) 46 Cal.4th 731, 752.) Among the specific factors to be considered are "'"'"the length of the interrogation [citation]; its location [citation]; [and] its continuity'. . . .'"'" (*Ibid.*) With respect to the defendant's circumstances, the relevant factors are "'"'"the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"'"' (*Ibid.*)

The interview at issue here was brief and free from any element of physical intimidation. There was no evidence that appellant was in poor physical condition. His argument that the confession was coerced is based solely on the contention that due to his limited intellectual capacity he viewed the detective's statement as a promise of leniency. As the trial court pointed out, however, the statement at issue referred to clearing one's conscience. That appellant did not mistake the detective's meaning is made evident by the fact that subsequent to the detective's statement, appellant repeatedly asked if there was a way to work things out and if

18

the detective could talk to the DA. From these statements, it is clear that he understood the detective had made no promise of literal freedom.

## C. *Failure to Instruct on Lesser Offense*

### 1. *Background*

With respect to count one, the jurors were instructed pursuant to CALCRIM No. 1123: "The defendant is charged in count 1 with aggravated sexual assault of a child who was under the age of 14 years and at least seven year younger than the defendant in violation of Penal Code section 269(a). To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed sodomy on another person; and [¶] 2. When the defendant acted, the other person was under the age [of] 14 years and was at least seven years younger than the defendant. To decide whether the defendant committed sodomy please refer to the separate instructions that I will give you on that crime." The only subsequent definition of sodomy given by the court was in connection with the third count for sodomy by force, in which sodomy was defined as "any penetration no matter how slight of the anus of one person by the penis of another person. Ejaculation is not required."[13]

During deliberations, after the jury had asked a series of questions about count three, defense counsel pointed out that aggravated sexual assault of a child as defined by section 269, subd. (a)(3) and CALCRIM No. 1123 requires more than

---

[13]     Because that instruction was given in connection with the crime of forcible sodomy, it went on to state: "In order to consent, a person must act freely and voluntarily and know the nature of the act. An act is accomplished by force if a person uses enough physical force to overcome the other person's will." In the original discussion of the instructions, defense counsel agreed that appellant's position was that the sexual acts did not take place at all, not that Crystal consented.

penetration, but also requires an element of force.[14]  The court agreed that the instruction given should have required the jury to find sodomy by force and called the jury back into court to amend the instruction on count one.  When the jurors arrived, they gave the court a note stating they had reached verdicts on counts one and two, and were hung on count three.  The court informed the jury that the instruction on count one contained a mistake.  The court explained the instruction "previously read 'the defendant committed sodomy on another person.'  It now reads, 'and you must find, to find the defendant guilty[,] the defendant committed sodomy by force on another person.'"[15]  The court went on to give further instruction on the meaning of the term "'force.'"  After hearing this, one juror asked if there was a separate offense of "sodomy of a minor."  The court stated that was a good question and that it would be answered after conference with counsel.

After the jurors returned to deliberations, the court and counsel tentatively agreed the jury should be instructed on the lesser offense of sodomy without force of a child under the age of 14 under section 286, subdivision (c)(1).[16]  Before

---

[14]     Section 269, subdivision (a)(3) defines aggravated sexual assault on a child as sodomy in violation of section 286 subdivision (c)(2), (c)(3), or (d).  Subdivision (c)(2) of section 286 requires the act to be accomplished "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury."  Subdivision (c)(3) of section 286 requires the act to be accomplished "by threatening to retaliate in the future against the victim or any other person . . . ."  Subdivision (d) of section 286 requires the act to be done "in concert with another person."

[15]     The court also read the entire revised instruction to the jurors and sent a copy into the jury room.

[16]     Section 286, subdivision (c)(1) provides that "[a]ny person who participates in an act of sodomy with another person who is under 14 years of age and more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years."  CALCRIM No. 1090 provides that to prove the defendant guilty of this crime, "the People must prove that:  [¶] 1. The defendant participated in an act of sodomy with another person; [¶] AND 2. At the time of the act, the other person was under the age of 14 years and was at least 10 years younger than the defendant."

20

receiving any additional instructions, the jurors sent out a note stating they were hung on counts one and three. Almost immediately thereafter, however, the jurors sent out a note stating they had reached a verdict on count one. The court concluded that the section 286, subdivision (c)(1) offense was not a lesser included offense and that there was no requirement that the court instruct on it sua sponte.[17] In view of the fact that the jurors had reached a verdict on count one, it did not instruct them further. Appellant contends the court committed reversible error in failing to instruct the jury on the offense of sodomy of a child under the age of 14 (§ 286, subd. (c)(1)) as a lesser included offense of aggravated sexual assault of a child under the age of 14 (§ 269, subd. (a)(3)).

### 2. *Analysis*

A trial court has a duty to instruct on a lesser included offense when there is sufficient evidence in the record to merit consideration by the jury that the defendant is guilty of only the lesser offense. (See, e.g., *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "An offense is necessarily included in another if . . . the greater statutory offense cannot be committed without committing the lesser because all of the elements of the lesser offense are included in the elements of the greater." (*People v. Hughes* (2002) 27 Cal.4th 287, 365.)

At the time the act in count one was allegedly committed (sometime between April 1997 and April 1998), section 286, subdivision (c)(1) provided punishment, as it does today, for "any person who participates in an act of sodomy

---

[17]     The court based its conclusion on the fact that section 286, subdivision (c)(1) requires that the victim be more than 10 years younger than the perpetrator, whereas section 269, subdivision (a)(3) requires that the victim be more than seven years younger than the perpetrator. As will be seen, in reaching this conclusion, the court mistakenly relied on the current version of section 269, which had been revised with respect to the age requirement subsequent to the time appellant committed the offense.

with another person who is under 14 years of age and more than 10 years younger than he or she . . . ." During the relevant timeframe, former section 269, subdivision (a) similarly provided a penalty for commission of certain types of sexual acts, including forcible sodomy, for "[a]ny person who commits any of the . . . acts upon a child who is under 14 years of age and 10 or more years younger than the person . . . ."[18] (Stats. 1994, 1st Ex. Sess., 1993-1994, ch. 48, § 1.) As both parties acknowledge in their briefs, the court relied on the language of the newer version of section 269 in concluding that section 286, subdivision (c) was not a lesser included offense of the crime charged in count one. The parties do not dispute that under the version of section 269 in effect at the time of the alleged offenses, section 286, subdivision (c)(1) was a lesser included offense. Respondent, however, disputes the existence of evidence to support a finding that appellant committed only the lesser and not the greater offense.

We agree there was no evidence presented to support the section 286, subdivision (c)(1) offense, assuming it was a lesser included offense of the charged crime.[19] The force needed to support a conviction for forcible sexual penetration need not be greater than the force needed to accomplish the act. (*In re Asencio* (2008) 166 Cal.App.4th 1195, 1205.) Crystal was eight years old, an age at which the ability to initiate or consent to a sexual act is nonexistent. She was asleep when

---

[18] Section 269 was amended in 2006 and currently provides a penalty for "[a]ny person who commits any of the [enumerated] acts upon a child who is under 14 years of age and *seven or more years younger* than the person . . . ." (Stats. 2006, ch. 337, § 6, italics added.)

[19] We note that even under the applicable version of section 269, it was technically possible to commit that crime without committing the section 286, subdivision (c)(1) crime. Former section 269 was violated when the victim was 10 or more years younger than the perpetrator. Section 286, subdivision (c)(1) is violated when the victim is more than 10 years younger. Thus, were the victim exactly 10 years younger, section 269 would be violated but section 286, subdivision (c)(1) would not.

22

the act alleged in count one began and suffered from a physical condition that made her weak. Appellant was a grown man in his 20's when he climbed into her bed, removed or pushed aside her clothing, placed his adult body on top of her, and penetrated her anally with his penis. During the entirety of the act, she was pinned to the bed, immobilized. Crystal testified that she protested in the only way she could, by crying and screaming. But whether or not the jury believed that testimony, the evidence established that the act could only have been accomplished by use of considerable force. The defense did not suggest otherwise. Rather it denied the incident ever happened. Accordingly, the court did not err in failing to instruct on the lesser offense of sodomy of a minor under section 286, subdivision (c)(1).

Moreover, even had the court committed instructional error, "in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence [is] reviewed for prejudice . . . under *Watson*." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178.)[20] Examining the entire record, we conclude it is not reasonably probable that any error affected the outcome. The evidence that appellant

---

[20] As the court explained in *Breverman*, it cannot be said that an erroneous failure to instruct on a lesser included offense is necessarily prejudicial: "[T]he sua sponte duty to instruct on a lesser included offense arises if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense. [Citation.] . . . In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight. [Citation.] [¶] Appellate review under *Watson*, on the other hand, takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury *could do*, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman*, *supra,* 19 Cal.4th at p. 177.)

repeatedly and regularly sodomized Crystal, the first time when she was eight, was overwhelming. Appellant essentially admitted it when confronted by Monica and John, and expressly admitted it in the interview with Detective Shumaker. Crystal's testimony was consistent in all significant details with her prior reports. The defense did not argue that insufficient force was used in perpetrating count one or that a lesser offense occurred, but that the act did not occur at all. Appellant's attempts to persuade the jurors that the entire matter had been fabricated was to no avail. We find it implausible that reasonable jurors could conclude that the force used to subdue and sodomize a physically weak child of eight was insufficient to support the force necessary to convict appellant of the offense charged in count one.

D. *Lay Testimony on Appellant's Intellectual Capacity*

1. *Background*

During trial, the court sustained an objection to a question defense counsel asked Detective Shumaker concerning whether during his investigation, he learned that both Crystal and appellant were "mentally challenged." The court ruled that lay witnesses could testify about concrete observations that might indicate a mental condition, but not about any specific diagnosis. During defense counsel's cross-examination of Aaron, he asked if Aaron considered appellant "a little bit mentally slow." The court sustained an objection and at a sidebar, suggested an Evidence Code section 402 hearing. At the hearing, the court stated that inquiry could properly be made of family members concerning appellant's level of comprehension and understanding of everyday conversations and instructions, as long as the witnesses did not testify to conclusions about his mental capacity. After the hearing, while Aaron was still in the courtroom, defense counsel

24

informed the court he did not wish to recall Aaron or ask him any further questions.

During defense counsel's cross-examination of John, counsel asked whether appellant had trouble understanding things he was told. John responded that appellant was not the "best conversationalist" and had not gone far in school. Defense counsel inquired whether appellant had trouble understanding anything John had said to him. The court sustained an objection to the question as phrased. Counsel did not re-phrase it but went on to another topic. John later testified in response to questioning from the prosecution that he had trouble understanding appellant sometimes. John further testified that appellant dressed himself, got himself to work, held down various jobs, and handled his own money John subsequently testified in response to questioning from the defense that appellant was unable to obtain a driver's license because he "wasn't catching on to the laws of the streets." Appellant contends the trial court erred in limiting the opinion testimony of Aaron and John concerning appellant's intellectual ability.

2. *Analysis*

Generally, a lay witness's testimony in the form of an opinion is limited to opinions "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understating of his [or her] testimony." (Evid. Code, § 800.) "A lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording." (*People v. Sergill* (1982) 138 Cal.App.3d 34, 40; see *People v. Melton* (1988) 44 Cal.3d 713, 744 ["A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony . . . .'"].) "'Whenever feasible "concluding" should be left to the jury.'" (*People v. Sergill*, *supra*, at p. 40.)

25

We review a trial court's ruling on the admission and exclusion of evidence under the abuse of discretion standard.  (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)  The erroneous exclusion of evidence requires reversal only where it is reasonably likely that the outcome of the case would have been different had the evidence been admitted.  (*People v. Rains* (1999) 75 Cal.App.4th 1165, 1170; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the court permitted Aaron and John to testify concerning their personal observations of appellant and his mental functioning, as long as they did not do so in a conclusory fashion.  This did not represent an abuse of discretion.  Aaron and John were competent to relate events they had observed, and were permitted to do so.  Indeed, John testified he believed appellant understood what he had done when confronted.  Neither, however, was competent to diagnose appellant or express an opinion concerning his mental condition.  Moreover, any error in this regard was necessarily harmless in view of the evidence.  Crystal's testimony was confirmed not only by appellant's own statements, but also by his behavior when confronted by John in 2010 and by Monica years earlier.  The evidence was overwhelming that the sexual abuse occurred and that appellant knowingly acknowledged his conduct.

E.  *Denial of Request for Continuance*

1.  *Background*

Shortly after the court ruled appellant's confession to Detective Shumaker was admissible, defense counsel stated he wished to call Dr. Kalechstein to testify with respect to masking.  The court stated there would need to be an Evidence Code section 402 hearing before the testimony could be admitted.  The court subsequently ruled that it would be appropriate for an expert to testify regarding the factors that could impact the reliability of a confession, including the

26

confessing party's mental capacity, and that an expert could also properly testify as to appellant's comprehension level to assist the jury in determining the reliability of the confession.  During the hearing, defense counsel reported that Dr. Kalechstein, whom he intended to call to testify concerning these matters, was unavailable until the following Monday, a week later.  Counsel requested a continuance, further stating that Dr. Kalechstein would need to perform additional research in the area of confessions and the factors that impact the reliability of confessions.

Preliminarily, the court observed that counsel's statement regarding Dr. Kalechstein's need to prepare raised doubt as to whether the psychologist would qualify as an expert in the field of confession reliability.  The court went on to deny the request as untimely, pointing out that the relevance of evidence relating to appellant's mental capacity and the reliability of the confession was apparent once the court ruled the confession admissible, and counsel could have informed the court of Dr. Kalechstein's scheduling conflicts before the jury was sworn. Alternatively, counsel could have asked the court to order Dr. Kalechstein to return when he was in court to testify at the pretrial hearing on the admissibility of the interview.  The court further noted that during voir dire, some of the jurors had revealed commitments that would interfere with their ability to return after a continuance, and that putting the trial over would result in the loss of jurors.  The court also pointed out that other evidence had been presented relevant to appellant's mental capacity and the reliability of the confession.  Appellant contends the trial court abused its discretion in refusing the request for continuance.

## 2. *Analysis*

"'The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction. [Citations.]'" (*People v. Zapien* (1993) 4 Cal.4th 929, 972, quoting *People v. Laursen* (1972) 8 Cal.3d 192, 204.) To establish good cause for a continuance in order to secure the presence of a witness, a defendant has the burden of "showing that he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven." (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.)

Defense counsel did not establish the materiality of Dr. Kalechstein's proposed testimony. It appeared from counsel's comments that the psychologist was not an expert on the reliability of confessions. (Cf. *People v. Page* (1991) 2 Cal.App.4th 161, 180-182 [expert in field of persuasion, interpersonal communication, and conformity was knowledgeable about studies indicating people's propensity to construct scenarios to link disparate elements together when confronted with seemingly incontrovertible evidence that contradicts their memories].) In addition, as the trial court noted, counsel was not diligent, either in informing the court of Dr. Kalechstein's scheduling conflicts prior to swearing the jury or in seeking the court's assistance at the prior hearing to secure Dr. Kalechstein's future appearance. Finally, the court's concern about the affect a

28

multi-day continuance would have on the ability to retain the jurors was a legitimate one. Under these circumstances, the court did not abuse its discretion in denying the request for continuance.

Appellant alternatively contends the denial of the continuance deprived him of his due process right to present a defense. "In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case . . . ." (*People v. Courts* (1985) 37 Cal.3d 784, 791.) "'[N]ot every denial of a request for more time . . . violates due process even if the party fails to offer evidence . . . .'" (*People v. Howard, supra,* 1 Cal.4th at pp. 1171-1172.) Here, the court's decision was not arbitrary, but based on the need to prevent the loss of jurors sure to result from an almost week-long continuance in the middle of a trial. The court also considered the importance of the evidence and whether similar evidence was available through other channels. As noted, it was by no means clear that Dr. Kalechstein would qualify as an expert in the area or that his testimony would be helpful. Family members offered an alternative manner of placing appellant's mental issues before the jury. The jury had before it the actual videotape of appellant's confession and could make its own determination whether appellant was truthfully admitting culpability or going along with the detective's version of events. Under these circumstances, we discern no error affecting appellant's federal constitutional rights.

F. *Ineffective Assistance of Counsel*

Appellant contends trial counsel was incompetent or ineffective for failing to arrange for Dr. Kalechstein's attendance at trial. In order to establish ineffective assistance of counsel sufficient to overturn a conviction, the defendant must show: "(1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability of an

adverse effect on the outcome.  [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, overruled on a different ground in *People v. Hill* (1998) 17 Cal.4th 800.)  "On direct appeal, a claim of ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 773.)  The defendant is required to affirmatively show that the omitted evidence would have made a difference; "[w]e cannot assume from a silent record that particular witnesses were ready, willing and able to give mitigating testimony, nor can we speculate concerning the probable content or substance of such testimony." (*Ibid.*)  We cannot conclude there was a reasonable probability that Dr. Kalechstein's testimony would have affected the outcome of the trial where neither his qualifications nor his expected testimony were clear.

G.  *CALCRIM No. 1120*

1.  *Background*

With respect to count two, continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)), the jury was instructed in accordance with CALCRIM No. 1120 as follows:  "To prove that the defendant is guilty of this crime, the People must prove that:  1. the defendant lived in the same home with the minor child; [¶] 2. the defendant engaged in three or more acts of substantial sexual conduct or lewd and lascivious conduct with the child; [¶] 3. three or more months passed between the first and last acts; and, [¶] 4. the child was under the age of 14 years at the time of the acts.  [¶] Substantial sexual conduct means oral copulation or masturbation of either the child or the perpetrator or penetration of the child's or perpetrator's vagina or rectum by the other person's penis or by any foreign object. [¶] *Lewd and Lascivious conduct is any willful touching of a child accomplished with the intent to sexually arouse the perpetrator or the child.  The touching need*

30

*not be done in a lewd or sexual manner*. Contact with a child's bare skin or private parts is not required, any part of the child's body or the clothes the child is wearing when [sic, should be 'may be'] touched." (Italics added.) The court further instructed the jurors: "Actually arousing, appealing to or gratifying the lust, passion or sexual desires of the perpetrator or child is not required for lewd and lascivious conduct."

Based on the italicized language, appellant contends CALCRIM No. 1120 is internally inconsistent and misleading because the phrase "'[t]he touching need not be done in a lewd or sexual manner'" negates the requirement that the lewd and lascivious conduct be "accomplished with the intent to sexually arouse the perpetrator or the child." He further contends the instruction is impermissibly argumentative because it emphasizes facts the prosecution is not required to prove -- that the conduct actually aroused or gratified the perpetrator or victim.

### 2. *Analysis*

#### a. *Lewd or Sexual Manner*

In *People v. Cuellar* (2012) 208 Cal.App.4th 1067, this court explained that the phrase at issue -- "[t]he touching need not be done in a lewd or sexual manner" -- was apparently intended to express "the long-established rule that touching of a sexual organ is not required for violation of the statute" and acknowledged that the language was "unfortunate and possibly confusing." (*Id*. at pp. 1070-1071.) We further stated: "It may be that, 'read as a whole' the sentence does no harm, although we think that is subject to question. It certainly does no good." (*Id*. at p. 1071.) We urged the Judicial Council's Advisory Committee on Criminal Jury Instructions to "reconsider the language of this sentence and propose new language that simply states that the touching need not be made to an intimate part of the victim's body, so long as it is done with the required intent" and explained "[i]f

31

that revision is made the two sentences would complement each other and any arguable inconsistency would be removed." (*Id*. at pp. 1071-1072.) We concluded, however, that the instruction as given did not mislead the jury in the case before us because "virtually all of the touching described in the testimony was sexual, rather than incidental, in nature" and "the evidence of defendant's guilt was overwhelming." (*Id*. at p. 1072.)

The same is true here. The charges were based primarily on appellant's repeated sodomy of his young half-sister. There was little evidence of incidental touching. Indeed, Crystal denied that she ever touched appellant's genitals or that he touched hers. Crystal described the final incident as appellant touching her buttocks while masturbating, but assuming the jury based any portion of the verdict on this testimony, there was no question concerning appellant's lewd and lascivious intent. The prosecutor did not argue that innocent touching could support the offense. To the contrary, she advised the jury that sexual intent was required to convict based on the lewd and lascivious acts of touching and kissing. Accordingly, we conclude any error in the language of the instruction was harmless.

b. *Argumentative*

Appellant contends that the language of CALCRIM No. 1120 was impermissibly argumentative. He focuses particularly on the language advising the jury that certain matters need not be proven to establish the offense, such as that the actions "[a]ctually arous[ed], appeal[ed] to or gratif[ied[ the lust, passions or sexual desires of the perpetrator or child . . . ." "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal . . . ." (*People v. Lee*

32

(2011) 51 Cal.4th 620, 638.)  The challenged provisions represent an accurate statement of the law.  Appellant failed to object to the language of the instruction.  Accordingly, he has forfeited this issue on appeal.  (*Ibid.*; *People v. Stone* (2008) 160 Cal.App.4th 323, 330-331.)

Moreover, we disagree that an instruction is necessarily argumentative when it informs the jurors of matters that need not be proven.  "An argumentative instruction 'invite[s] the jury to draw inferences favorable to [a party] from specified items of evidence on a disputed question of fact . . . .'"  (*People v. Flores* (2007) 157 Cal.App.4th 216, 220, quoting *People v. Wright* (1988) 45 Cal.3d 1126, 1135 [rejecting contention that assault instruction informing jury that prosecution need not prove that touching caused pain or injury was impermissibly argumentative].)  Here, the instruction merely assisted the jury in understanding difficult and unfamiliar concepts and corrected misconceptions a lay person might have about sexual gratification or arousal being an element of a sexual abuse crime.  It did not highlight any evidence or invite the jury to draw improper inferences favorable to the prosecution.  Accordingly, we reject the contention that the instruction was unnecessarily argumentative.

H.  *Sentencing Issues*

1.  *Discretion to Impose Concurrent Sentence*

The prosecution's sentencing memorandum stated that "[t]he crimes of which [appellant] was convicted in this case require consecutive sentencing," citing section 667.6, subdivision (d).  After imposing a sentence of 15 years to life on count one, the court imposed a consecutive upper term sentence of 16 years on count two.  The court stated it was doing so "pursuant to the Penal Code."

Section 667.6, subdivision (d), provides that "[a] full, separate, and consecutive term shall be imposed for each violation of any offense specified in

33

subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." The crime of continuous sexual abuse of a child, a violation of section 288.5, is specified in section 667.6, subdivision (e)(6). However, the parties agree that section 288.5 was added to this provision in 2006, and that during the relevant period (from April 1998 to April 2003), the Penal Code did not require mandatory consecutive sentencing for this offense. Accordingly, it appears the trial court did not exercise discretion in imposing the consecutive sentence on count two.

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record. [Citation.]" (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) When a court may have been influenced by an erroneous understanding of the scope of its sentencing powers, remand for reconsideration of the sentence imposed is appropriate. (*Ibid*.; see *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257-258 [ex post facto clauses of United States and California Constitutions preclude sentencing under laws inflicting greater punishment enacted after offense committed, and ex post facto violation may be raised for first time on appeal].)[21] Because the record indicates the court was unaware of its discretion, we remand for reconsideration of the sentence on count two.

_____

[21] Because we conclude remand is required for resentencing of count two based on the trial court's failure to exercise discretion, we need not address appellant's alternate contention that the matter must be remanded because the court failed to adequately explain its reasons for imposing consecutive terms.

### 2. *Restitution Fine*

The trial court imposed a sex offender restitution fine in the sum of $500 pursuant to section 294, which permits imposition of such fine based on "the defendant's ability to pay." Appellant contends substantial evidence does not support the finding of ability to pay. In imposing the $500 fine, after initially proposing a fine of $1,000, the court noted that "[t]ypically, the funds that are ordered would be paid out of any money that the defendant makes while under the custody of the Department of Corrections." In determining ability to pay, the trial court may properly consider the defendant's prospective prison wages. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376-1377; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.) Because the court based the amount of restitution on appellant's future ability to pay from prison wages, the amount of the fine was adequately supported.

## DISPOSITION

The sentence on count two is vacated and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.

36